DONOHO et al. v. CARWILE et al.
(No. 7886.)

(Court of Civil Appeals of Texas. Dallas. May 10, 1919. Rehearing Denied July 5, 1919.)

1. CORPORATIONS ⚹⚹229 — STOCKHOLDERS' LIABILITY — TERMINATION — COMPROMISE AGREEMENT WITH CORPORATION.

Where promoter of land development corporation turned land over to corporation in return for stock in value largely in excess of actual value of land, and thereafter made compromise agreement with other stockholders whereby he surrendered his stock and resigned as president in consideration of corporation conveying land to him, such agreement terminated his liability as stockholder.

2. CORPORATIONS ⚹⚹232(3) — STOCKHOLDERS' LIABILITY—PAYMENT FOR STOCKS—LAND.

Conveyance of land to corporation for stock of value largely in excess of actual value of land does not constitute payment for such stock.

3. CORPORATIONS ⚹⚹229 — STOCKHOLDERS' LIABILITY—SUBSCRIPTIONS—RESCISSION.

Subscribers for stock with option of rescinding were not liable on subscription contract for debts of corporations, where they rescinded subscription before the enfranchisement of the corporation and its organization, and before any liability to any creditor or stockholder was incurred.

4. CORPORATIONS ⚹⚹269(2)—ACTION TO ENFORCE STOCKHOLDERS' LIABILITY—COMPROMISE AGREEMENT—EVIDENCE.

In action against stockholders of insolvent corporation upon vendor's lien notes of the corporation, where defense was that plaintiffs had agreed to surrender notes in consideration of certain amount of stock, evidence that plaintiffs had foreclosed the notes, purchased the land, conveyed it to another corporation for amount of stock they had agreed to accept from former corporation, and had caused stock to be issued to subscribers of stock in former corporation in amount of subscription, *held* admissible in proof of such agreement.

5. APPEAL AND ERROR ⚹⚹1050(1)—HARMLESS ERROR—EVIDENCE.

Admission of evidence was harmless, where witness testified without objection to substantially same facts.

6. APPEAL AND ERROR ⚹⚹231(3) — ADMISSION OF EVIDENCE—GROUNDS OF OBJECTION.

Assignment of error complaining of admission of evidence will not be reviewed on appeal, where the evidence was objected to without ground of objection being specified.

7. CORPORATIONS ⚹⚹269(2) — STOCKHOLDERS' LIABILITY—ACTIONS—EVIDENCE.

In action against stockholders of insolvent corporation, by its creditors, a contract, whereby one of the defendants being sued as stockholder had delivered his stock to the other stockholders and had terminated his relationship with the corporation upon conveyance by corporation to him of the land for which the stock had been issued, was admissible.

8. CORPORATIONS ⚹⚹269(2) — STOCKHOLDERS' LIABILITY—ACTION—EVIDENCE.

In action against stockholders of insolvent corporation upon vendor's lien notes of the corporation, where defense was that plaintiffs had agreed to surrender notes for stock of the corporation, the contract whereby such agreement had been entered into was admissible in evidence.

---

⚹⚹For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**9. APPEAL AND ERROR ⊚⟿1050(1)—REVIEW—HARMLESS ERROR.**

The admission of self-serving statement was harmless, where it was not a statement of a fact or circumstance of material importance.

**10. EVIDENCE ⊚⟿459(1)—WRITTEN CONTRACT—PAROL TESTIMONY.**

Where parties denied being bound by written contract purporting to have been made on their behalf, testimony as to statements, made at time contract was prepared and signed, as to whom contract was being made on behalf of, was admissible and not objectionable as tending to vary terms of contract.

**11. CORPORATIONS ⊚⟿269(2)—STOCKHOLDERS' LIABILITY—ACTION—EVIDENCE.**

In action against stockholders of insolvent corporation on vendor's lien notes of corporation defended on ground that plaintiffs had agreed to surrender the notes for certain amount of stock, evidence that a new corporation had been organized in consummation of such agreement *held* admissible.

**12. WITNESSES ⊚⟿246(1)—EXAMINATION BY COURT.**

That court examined witness, after differences had arisen between counsel as whether witness had testified to certain facts, did not render his testimony inadmissible.

**13. TRIAL ⊚⟿29(3)—STOCKHOLDERS' LIABILITY—ACTION—PREJUDICE OF COURT.**

In action against stockholders of insolvent corporation on vendor's lien notes of corporation, where defense was agreement by plaintiffs' to surrender notes for stock of the corporation, court by eliciting testimony that corporation to which plaintiffs had conveyed land after having foreclosed liens and purchased property, had agreed to sell property for certain price, did not indicate bias or prejudice.

**14. APPEAL AND ERROR ⊚⟿201(2)—OBJECTIONS IN LOWER COURT—MISCONDUCT OF COURT.**

Assignment of error complaining of court's action in eliciting certain testimony will not be considered on appeal, where no objection was made to matter complained of at time of trial.

**15. CORPORATIONS ⊚⟿269(1)—STOCKHOLDERS' LIABILITY—BURDEN OF PROOF.**

In action against stockholders of insolvent corporation on notes of the corporation, defended upon ground that plaintiffs had agreed to surrender the notes for stock of the corporation, plaintiffs had burden of establishing their case, but burden of proving agreement was upon defendants.

**16. EVIDENCE ⊚⟿91, 94—BURDEN OF PROOF.**

Generally, burden of proof remains on party offering a fact in support of his case and does not change in any aspect of the cause, though the weight of evidence may shift from side to side, according to the nature and strength of the proof offered in support or denial of the main fact to be established.

**17. APPEAL AND ERROR ⊚⟿216(1)—INSTRUCTIONS—OBJECTION BELOW—TENDER OF SPECIAL CHARGE.**

Failure to give instructions will not be considered on appeal, where no objection to main charge was made on ground that it did not contain such instruction, and no special charge was tendered.

**18. NEW TRIAL ⊚⟿99—DISCRETION OF COURT.**

The granting of new trial upon ground of newly discovered evidence is discretionary with court.

**19. NEW TRIAL ⊚⟿104(1)—NEWLY DISCOVERED EVIDENCE — CUMULATIVE EVIDENCE — ABUSE OF DISCRETION.**

Court did not abuse its discretion in denying motion for new trial on ground of newly discovered evidence, where such evidence was cumulative in tendency.

Error from District Court, Dallas County; E. B. Muse, Judge.

Suit by C. D. Donoho and others against W. L. Carwile and others. Judgment for defendants, and plaintiffs bring error. Affirmed.

E. G. Senter, of Washington, D. C., and D. W. Odell, of Ft. Worth, for plaintiffs in error.

Thompson, Knight, Baker & Harris and A. F. Weisberg, all of Dallas, for defendants in error.

RASBURY, J. The plaintiffs in error, C. D. Donoho, P. K. Thompson, A. S. Laird, and E. G. Senter, filed this suit in the court below against the defendants in error, W. L. Carwile, S. J. McFarland, Edwin Hobby, and the Interurban Land & Development Company, a private corporation. For the sake of brevity, they will be hereinafter alluded to, respectively, as plaintiffs and defendants; that being their positions in the trial court.

The suit was grounded upon eight promissory notes executed by the defendant Interurban Land & Development Company, dated June 13, 1913, each for the principal sum of $1,562.50, bearing 8 per cent. per annum interest, payable semiannually, providing for 10 per cent. attorney's fees in case of default in payment of interest or principal, and secured by a secondary vendor's lien upon 200 acres of land in Dallas county, conveyed by plaintiffs to the Interurban Land & Development Company, in part payment of which the notes were executed. Liability against defendants, other than the Interurban Land & Development Company, which was alleged to be insolvent, was based on the allegation that they had subscribed to stock in the corporation which they had not paid, and as a consequence were responsible to plaintiffs as creditors of the corporation

⊚⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

to the extent of such subscriptions, which in the case of defendant Carwile was $8,000, of defendant Hobby $4,000, and of defendant McFarland $2,500. Liability for the further sum of $1,866 was alleged on the ground that when defendant Interurban Land & Development Company purchased plaintiffs' land, acting by said Carwile, it withheld from the cash consideration said amount, which represented interest about to mature on the first lien notes and for which plaintiffs were responsible, and which amount it is alleged Carwile, with the assistance of Hobby and McFarland, appropriated to his personal use. Further liability was charged against Carwile personally on the ground that he had converted $3,000 of the funds of the defendant Interurban Land & Development Company to his personal use. On the ground stated, prayer was that defendants be compelled to contribute to the payment of plaintiffs' debt to the extent in which their liability was shown. The foregoing are the general grounds upon which liability for the debt was sought to be charged against defendants. The facts and circumstances which brought about the alleged liability are particularized in the pleading. They are not stated here, for the reason that they will be included in our statement of the facts. · Defendants generally and specially denied the allegations of plaintiffs' petition, and further specially averred a compromise and settlement of all differences between the parties.

Trial was by jury to whom special issues of fact were submitted by the court at the request of both parties. Upon the answers of the jury thereto, judgment was for the defendants, from which this appeal is prosecuted.

The salient and controlling facts, all conflicts being resolved in support of the verdict of the jury, stated in our language are, in substance, briefly these: W. N. Mayfield of Dallas conceived the organization of a corporation for the purpose of acquiring two adjoining tracts of land in Dallas county, which he believed could be subdivided and sold in small tracts at a profit. One of the tracts, consisting of 200 acres, was owned in common by the plaintiff who understood Mayfield's plan. The other tract contained 110 acres and was owned by Ed S. Lauderdale. In time Mayfield commenced negotiations with plaintiff Laird, who, in conjunction with plaintiff Senter, represented the other owners of the 200-acre tract. About the same time Mayfield sought the assistance of the defendant Carwile, advising him of his plan and that he believed plaintiffs' tract could be bought for $200 per acre, an advance of $10 per acre over what they paid for it, and that the Lauderdale tract could be bought for approximately $9,000

and the two tracts sold to the proposed corporation for $200 per acre. To induce Carwile to interest himself in the plan, Mayfield offered him one-half of whatever profit was realized in the purchase of the Lauderdale tract and its sale to the corporation, if Carwile would advance the cash payments necessary to acquire same. Mayfield finally purchased the Lauderdale land for $7,500, taking deed in his name; Carwile, however, advancing the cash payment of $1,500. Mayfield also had a tentative agreement with plaintiffs to purchase their tract at $200 per acre. At this point Mayfield set about securing subscriptions to the capital stock of the proposed corporation, by securing subscriptions in the usual way. All money so collected was deposited with Edwin Hobby as trustee. The subscription lists recited, in substance, that it was the purpose of those signing to organize a corporation capitalized at $27,500 to purchase a tract of 310 acres of land at Fowler station on the Dallas-Fort Worth Interurban Railway, nine miles west of Dallas, the price of the land to be $200 per acre, or a total of $62,000 for the 310 acres; the capital stock of the company to represent the first cash payment thereon.

Ultimately, as a step towards the culmination of the plan, Mayfield, and plaintiffs, conveyed the respective tracts of land to Edwin Hobby; the deeds reciting that the land was to be held by Hobby in trust pending incorporation of the Interurban Land & Development Company and to be conveyed to that concern upon the consideration recited therein upon proof of its incorporation. Subsequently, those interested conferred for the purpose of preparing and executing articles of incorporation, at which time it developed that sufficient cash subscriptions had not been obtained to authorize incorporation. To overcome the difficulty, all present agreed that Carwile should deliver to Hobby, the trustee, his check for $14,000 in order that Hobby as trustee could make affidavit that there was deposited with him a sum in excess or amounting to 50 per cent. of the authorized capital stock of the proposed corporation, with the understanding that when the corporation was enfranchised it should repay Carwile the money so paid and assume the Lauderdale mortgage on the tract sold to Mayfield and issue stock for the balance of the purchase price. After the understanding just related, articles of incorporation were prepared under professional direction of plaintiff Senter. Those named as directors were W. L. Carwile, W. N. Mayfield, E. G. Senter, Cecil T. Casey, J. C. Everett, J. V. Dupies, and Edwin Hobby. Attached to the articles was a list containing the names of the subscribers and the amounts of their respective subscriptions, aggregating $30,000, together with the affidavit of W. N. Mayfield, W. L. Carwile, and

E. G. Senter, reciting, in substance, that of the $30,000 of subscriptions $28,000 had been paid, and that the directors named therein all resided in Dallas county, Tex.; also, the affidavit of Edwin Hobby, reciting that there was deposited with him as trustee for the proposed corporation in excess of $15,000. On the list of those having subscribed and paid for stock was Edwin Hobby $4,000, S. J. McFarland $3,000, E. G. Senter $1,000, W. L. Carwile $8,000, paid $7,000, W. N. Mayfield $2,000, paid $1,000. . Hobby and McFarland subscribed at the solicitation of Carwile to stock on condition that Carwile would relieve them from liability at their option.

Before the corporation was enfranchised, they declined to take the stock, and Carwile agreed to take what they had subscribed to. The articles, with the proof recited attached, were forwarded by plaintiff Senter to the Secretary of State, who approved the articles and filed them in his office. The directors named in the charter met subsequently, those present being Carwile, Mayfield, Senter, and Casey, and elected Carwile president, Casey secretary, appointed Senter, Mayfield, and Hobby to prepare and submit by-laws, and authorized the purchase of the plaintiffs' 200-acre tract, on the terms specified in the deed to Hobby, as well as the purchase of the Lauderdale tract on the terms specified in the deed from Mayfield to Hobby; the president being in that respect authorized to execute all notes, instruments, etc., necessary in his judgment to complete such transactions. Thereafter, Edwin Hobby, trustee, in compliance with the terms of the conveyance to him by plaintiffs Laird, Donoho, Senter, and Thompson, conveyed plaintiffs' 200-acre tract to the Interurban Land & Development Company, in consideration of $40,000, of which $10,000 was paid in cash, $17,000 by assuming two notes, one for $2,500 due October 16, 1913, and one for $15,000 due October 16, 1916, then existing against the land in favor of the National Benevolent Association, and secured by the vendor's lien, and $12,500 evidenced by the corporation's eight promissory notes, each for $1,562.50, two payable to Laird, two to Donoho, two to Senter, and two to Thompson, four of said notes maturing October 1, 1914, and four October 1, 1915, all secured in payment by lien on the land secondary to that securing the debt of the National Benevolent Association. From the cash payment to plaintiffs, among other items, was deducted by the corporation $1,886. This sum represented earned interest on the $17,500 debt which the corporation assumed. The cash paid plaintiffs by Hobby was from cash subscriptions to stock in the corporation. Hobby as trustee also conveyed to the Interurban Land & Development Company the 110 acres known as the Lauderdale tract.

Only a general statement that this deed was introduced appears in the record. There is, however, in the record oral testimony establishing that the consideration was $22,000, which was paid by the corporation's assuming $6,000 of purchase-money notes due from Mayfield to Lauderdale, paying the $1,500 advanced by Mayfield and Carwile, which was also paid from the cash subscription to stock and issuing its stock for $14,500.

When the corporation acquired the land, it was for the purpose of dividing it into small tracts for suburban homes. In order to make sales possible, it was necessary to have the tracts as sold released from both the first and second liens. At all events, plaintiffs informed those acting for the corporation that they had such an arrangement with the holder of the first lien and would insert a similar agreement in the deed to the corporation as between the corporation and themselves. The agreement was omitted from the deed. Deed of correction, including the provision, was promised, but never executed. As a consequence, it was impossible to effect what defendants term a "selling campaign," for the reason that prospective purchasers would demand some arrangement of the first and second lien notes before purchasing. The corporation's plan was to subdivide the land and sell same at once in order to provide funds with which to meet its indebtedness. In the meantime, the $2,500 first lien note and interest, as well as the interest on the $15,000 first lien note, which the corporation assumed, matured, and default was made in its payment for the reason that the corporation had no funds. The first lien holder thereupon declared the entire debt due as it had the right to do and advertised the property for sale for the first Tuesday in February, 1914. Meanwhile, the semiannual interest on plaintiffs' second lien notes matured and was not paid, which fact matured the second lien notes at the option of plaintiffs. On promise to pay $500 to the owners, plaintiffs secured a 60-day extension of the first lien debt, which deferred the sale thereunder, and at once advertised the land for sale under their second lien for the first Tuesday in March, 1914. Plaintiffs failed, however, to pay the $500 promised the first lien holder. Thereupon Carwile purchased from the holder the first lien debt and advertised the land for sale thereunder, simultaneously in time with the sale under the second lien.

Much is developed in the evidence by both parties concerning the motives of each in advertising the land for sale under the respective liens and what preceded such action; but, inasmuch as the net result was the advertisements, a statement of such evidence will be of no consequence, and for that reason is omitted. Matters so standing, Carwile and Laird and Senter tentatively reached

an agreement, by which both debts were to be extended for such time as would enable the corporation to sell some of its land and ease its financial stress, but which Carwile declined to execute. About this time certain subscribers to the stock of the corporation learned for the first time that the Lauderdale tract had been conveyed to the corporation at an advance of $14,500 above what had been paid for it, and for which corporate stock had been issued to Carwile. The disclosure evoked considerable discussion among those not previously aware of the fact. As a result, Carwile called a stockholders' meeting, the upshot of which was the appointment of a committee from the stockholders who conferred with Carwile and plaintiffs and an oral agreement reached for adjustment of all matters. The agreement was detailed to the attorneys for the corporation, who reduced same to writing. The agreement was signed by Carwile individually and by Hugh E. Prather, claiming to represent all the stockholders in the Interurban Land & Development Company, other than those owning the $14,500 which represented the profit on the Lauderdale tract. The agreement, after reciting that the parties desired to compromise differences which had arisen concerning the management of the corporation, provided, so far as is necessary to state, in substance, that Carwile would secure $14,500 of the stock of the Interurban Land & Development Company and deliver same canceled to Prather and associates, pay them $1,875 cash, which sum represented the cash payment on the Lauderdale tract, advanced to Carwile, and $375 collected by him as rentals for the lands of the corporation, and resign from the presidency of the corporation. Prather and associates agreed to procure the conveyance of the Lauderdale tract of land to Carwile, who was to assume the incumbrance thereon; pay the first lien notes against the Fowler tract of land held by Carwile, on condition that Carwile would transfer the lien as directed. Carwile and plaintiffs agreed to withdraw their respective notices of sale and abandon same. The agreement was to be consummated in 30 days, and, when consummated, should acquit all of any liability to the other.

Simultaneously with the execution of the foregoing agreement, another was executed between Prather, representing all the stockholders (other than those owning the stock agreed to be secured and delivered by Carwile), and Laird, Senter, Donoho, and Thompson, the plaintiffs herein and owners of the second lien notes against the Fowler tract, aggregating $12,500, by which they ratified and confirmed the contract between Prather and Carwile and agreed to cancel their second lien notes and deliver same to Prather in consideration of the delivery to them by Prather of $13,000 of the capital stock of the Interurban Land & Development Company

on condition that when the contract between Prather and Carwile was consummated the Interurban Land & Development Company was the owner of the Fowler 200-acre tract, subject only to the first lien notes held by Carwile, and that there should be outstanding of the capital stock of the Interurban Land & Development Company only $10,000 plus the $13,000 of stock to be delivered to them. After execution and delivery of the foregoing contracts, both Carwile and plaintiffs withdrew notices of their respective sales and abandoned same. Carwile secured and delivered to Prather the $14,500 of stock, paid the $1,875 cash, and resigned as president of the Interurban Land & Development Company. Prather was elected president of the corporation to succeed Carwile, and at a special meeting of the directors, those present being Prather, Laird, Senter, Dupies, and Hardy, the president and secretary were authorized to procure a loan of $18,500 from G. W. Owens with which to take over and renew and extend the first lien notes then held by Carwile. Owens did, at request of Senter and Laird, take over the notes and lien held by Carwile. The Interurban Land & Development Company by appropriate action authorized its officers to execute deed to the Lauderdale tract to Carwile, which they did; Carwile assuming the incumbrance thereon. The several things done by the parties under their respective contracts, just recited, were not accomplished within the 30 days specified in the contract between Prather and associates and Carwile; but the evidence will warrant the conclusion both of mutual extension and subsequent ratification and acquiescence in what was actually done. Subsequent to the foregoing, the owners of the second lien notes against the Fowler tract of 200 acres, Laird, Senter, Donoho, and Thompson advertised and sold same for an inconsequential sum, which was credited upon the notes, Laird being the purchaser at the sale, conveying subsequently a fourth interest therein to his coplaintiffs. Thereafter, the Fowler Land Company, a private corporation, was organized and enfranchised; the original directors being Hugh E. Prather, H. D. Lindsley, and A. S. Laird. After its organization, the title to the Fowler 200 acres acquired at the sale under the second lien notes was conveyed to the Fowler Land Company. The Interurban Land & Development Company, by its proper officers and under authority of appropriate resolution, conveyed by quitclaim deed whatever interest it had in said 200-acre tract to the Fowler Land Company in consideration of the assumption by the vendee of the first lien thereon. The 200 acres of land are all the assets of the corporation. The authorized capital stock of the Fowler Land Company was $25,000. Originally certificates of stock for $3,500 were issued to Laird, Senter, Donoho, and Thompson each, and one for $10,000 to them

collectively. Subsequently, the certificate for $10,000 was surrendered and $8,500 thereof issued to Prather, Lindsley, Dupies, Nicholson, Hardy, Irish, Tenison and Flippen former subscribers in the Interurban Land & Development Company, in the amount to which they had formerly subscribed to the stock of the last-named corporation; the balance of the stock remaining subject to the action of the new corporation.

The first assignment presents the contention that the court erred in refusing to peremptorily direct verdict for plaintiffs for the reason that 'the evidence disclosed without controversy that the Interurban Land & Development Company was insolvent, was indebted to plaintiffs in the amount sued for, and that the defendants had subscribed to its capital stock in the amounts alleged for which they had not paid. Ordinarily, under the facts recited, subscribers to the capital stock of a corporation would be liable to creditors in the manner claimed. The jury found, however, in response to various issues of fact submitted to them, that any liability of defendants as subscribers to the stock of the Interurban Land & Development Company had been compromised by the agreements referred to in this opinion with the consent, acquiescence, and authority of plaintiffs, the Interurban Land & Development Company, its officers, directors, and stockholders, and that thereafter all matters therein agreed to be performed were consummated. Such compromise agreements plaintiffs in final analysis assert did not include or contemplate any adjustment of defendants' liability as subscribers to the stock of the corporation. In short, that they were separate transactions, the stock of $14,500 being in payment of the profit made on the Lauderdale tract of land, while the subscriptions were merely agreements to purchase that much additional stock. Concerning these subscriptions, it is not in dispute that each of the defendants subscribed for the amount claimed. Hobby and McFarland subscribed at the solicitation of Carwile with the understanding that they might recede from their obligation before organization. This they did. Carwile assumed their obligation. Carwile testified that his subscription to the capital stock of the corporation, as well as the Hobby and McFarland subscriptions which he assumed, were paid for with the stock issued for the profit made out of the Lauderdale tract, and that it was at all times the understanding that it should be paid in that manner.

[1, 2] We do not find this claim disputed. Reference to the compromise agreements will disclose that it was this stock that the plaintiffs and all the other subscribers required Carwile to surrender as part of the adjustment. Assuming then that Carwile was in legal contemplation a promoter of the Interurban Land & Development Company, and subject to the liability generally enforced against promoters, and conceding it to be a fact that he turned into the corporation the Lauderdale land at a sum largely in excess of its actual value, and waiving the question of whether plaintiffs had full knowledge of that fact at that time, we nevertheless conclude that his liability in that respect was contemplated and included in the compromise agreements, and if such agreements were consummated his liability as a subscriber adjudged and discharged, notwithstanding that we are also of the opinion that as against creditors and bona fide subscribers to the stock the payment of the stock subscription by overvaluation of the land was not in law a payment. We base our conclusion upon the legal effect of the compromise agreements and the performance of their provisions. Gilliam v. Alford, 69 Tex. 267, 6 S. W. 757; Houston & Tex. Cen. R. Co. v. McCarty, 94 Tex. 298, 60 S. W. 430, 53 L. R. A. 507, 86 Am. St. Rep. 854. In the case first cited, omitting some of the details, the husband of Mrs. Gilliam agreed to pay Alford $4,000 in consideration that Alford would pay the dues and assessments on two certificates of $3,000 each in the American Legion of Honor when the certificates became payable; one being payable to Gilliam's wife at his death, and the other payable to him or his children at the death of his wife. Gilliam died, at which time a controversy arose between his widow and Alford in relation to their respective rights. The matter was finally compromised by Mrs. Gilliam paying Alford $2,000 in full satisfaction of his claims under the contract and by Mrs. Gilliam agreeing to repay to Alford the assessments paid on the policy on her life and payable at that time to her children. It was the rule then, as it is now, that such contracts are enforceable to the amount only of the assessments and dues paid, with interest; but on the facts related in a suit by Mrs. Gilliam to recover the amount paid the court upheld the compromise, declaring that—

"Voluntary settlements are so favored that if a doubt or dispute exists between the parties with respect to their rights, and all have the same knowledge or means of obtaining knowledge concerning the circumstances involving those rights, and there is no fraud, misrepresentation, concealment, or other misleading incident, a compromise into which they have voluntarily entered must stand and be enforced, although the final issue may be different from that which was anticipated, and although the disposition made by the parties in their agreement may not be that which the court would have decreed had the controversy been brought before it for decision."

Whatever may have been the knowledge of the plaintiffs and the bona fide subscribers to the stock at the inception of the matter

concerning the profit Carwile sought to make upon the Lauderdale land and the issuance of the "watered" stock in that connection, that matter was surely bared at the several meetings and discussions prior to the time the agreements were signed and delivered. The one subject of discussion was that fact, and the one purpose of the meeting to require Carwile to surrender the stock, repay the Interurban Land & Development Company the cash advanced on the Lauderdale land, receive it back and assume the payment of the mortgage thereon, and retire from further connection with the corporation. Such was the prime object of the agreements between the several contracting parties. All interested, including plaintiffs, possessed full knowledge of the facts, concerning which no fraud, misrepresentation, or concealment was practiced. It may be that Carwile, all other issues aside, would have been liable on his subscription, or, as some authority indicates, upon the watered stock for plaintiffs' debt but for the compromise; but, as the court say in the case cited, "if a doubt or dispute exists between the parties with respect to their rights," the compromise will be enforced whatever might have been the result in a proceeding in court.

On the issue of compromise, plaintiffs also assert that the finding of the jury that the matters required to be performed by the compromise agreements were in fact consummated is without support in the evidence. We have examined the evidence on the matter pointed out by plaintiffs, and we are not prepared to say that the finding is without such support. We could in deference to counsel quote the evidence, but it would serve no useful purpose to do so. Upon us is the duty and responsibility in such case, and we apprehend it is sufficient to state our conclusions, since they may be reviewed.

[3] As relates to defendants Hobby and McFarland, while our holding that the compromise satisfied all liability on the subscription contracts would release them as well as Carwile, we also are of opinion that they are not liable on other grounds urged by their counsel. Their subscription was made with the option of rescinding. Rescission was made, and before the enfranchisement of the corporation or its organization, and before any liability to any creditor or stockholder was incurred. The corporation agreed and consented to the arrangement and issued the stock to Carwile, who assumed their liability in that behalf. Plaintiffs cannot complain that the promoters released Hobby and McFarland and the corporation confirmed that act at a time prior to plaintiffs' sale to the corporation and consequent reliance on its assets.

[4] The second assignment complains of the action of the court in permitting counsel for defendants, over objections of plaintiffs, to elicit from the witness Laird on cross-examination the statement that, after plaintiffs bought the Fowler tract under forced sale against the Interurban Land & Development Company, they organized and enfranchised the Fowler Land Company with an authorized capital stock of $25,000, certificates for $3,500 of which was issued to each plaintiff and one for $10,000 to plaintiffs collectively, which in turn was surrendered and issued to Hugh Prather and his associates, and to which corporation plaintiffs conveyed the Fowler tract. We conclude the evidence was admissible. It was alleged by the defendants that the incorporation of the Fowler Land Company and the distribution of its stock was in consummation of that portion of the compromise agreement affecting plaintiffs and Hugh Prather and associates. By the contract between Prather and associates and defendants the latter agreed to surrender and cancel their second lien notes in consideration of the delivery to them of $13,000 of stock in the Interurban Land & Development Company, which latter corporation the parties agreed was to own the Fowler tract of land and have outstanding of its capital stock the $13,000 agreed to be delivered to plaintiffs and the $10,000 mentioned in the contract between Carwile and Hugh Prather and associates, and which represented the bona fide subscriptions to the Interurban Land & Development Company. Instead of surrendering and canceling their notes, plaintiffs foreclosed them against the Interurban Land & Development Company and secured title in themselves to the Fowler tract. That fact alone might not tend to prove defendants' allegations. But the further fact that plaintiffs conveyed the land to the Fowler Land Company for the amount of stock they agreed to accept in the Interurban Land & Development Company and caused to be issued to Prather and associates the amount of stock they have formerly subscribed in the Interurban Land & Development Company does, in our opinion, present facts strongly in support of the allegation.

[5] Further, the admission of the testimony is harmless, for the reason that the witness Laird testified without objection that the organization of the Fowler Land Company was by agreement between plaintiffs and Prather and associates, and that the latter were to receive as much stock in the Fowler Land Company as they had subscribed to in the Interurban Land & Development Company; that their interest in the new corporation was to be measured by their interest in the old one.

The third assignment complains of the action of the court in permitting counsel for defendants to elicit from the witness Laird the statement that plaintiffs had owned the Fowler tract for two years when it was sold to the Interurban Land & Development Company at a profit of $10,000. The bill preserving the

objection discloses that the witness at other times during the trial testified to substantially the same facts without objection, and it so appears from the record. While the testimony might be justified on other grounds, it has been repeatedly ruled that the fact that the same testimony was admitted without objection affords sufficient reason for holding that it does not, even if erroneous, constitute reversible error.

[6-8] The fourth assignment of error complains of the admission in testimony of the contract between Carwile and Prather and associates, while the fifth assignment complains of the admission in testimony of the contract between Prather and associates and plaintiffs, both of which we have substantially recited in our statement of the case. Numerous objections to the admission of the agreements are raised by plaintiffs. Defendants urge that the action of the court should not be reviewed for the reason that the bills of exception taken at the time merely disclose that the plaintiffs merely objected to the admission of the contracts without specifying the ground of the objection. While the reason urged by defendants for refusing to review the action of the court is undeniably sufficient, we are also of opinion that the contracts in the light of the pleading were both relevant and pertinent.

[9] The sixth assignment of error complains of the action of the court in permitting the witness J. Hart Willis to testify, over plaintiffs' objection, that Carwile, while consulting with the witness as attorney, advised him that the Interurban Land & Development Company was in trouble, its property having been advertised for sale by the holders of second lien notes, and that he desired to protect its stockholders, and that the witness had advised him how to proceed. The contention is that the testimony is hearsay and self-serving. If there is any portion of the testimony that was improperly admitted, it is the statement of Carwile repeated by the witness that he (Carwile) desired to "protect" the stockholders of the corporation. That statement alone is not sufficient to constitute reversible error, even though it be self-serving. The declaration by Carwile that he desired to protect the interest of the stockholders may be conceded to be technically self-serving, so far as relates to his motives in the management of the corporation. It was not, however, the statement of a fact or circumstance of material importance upon the issues of the case. At most, the testimony was, in our opinion, harmless.

[10] Complaint is also made of the action of the court in permitting the same witness to testify, over plaintiffs' objection, that he and plaintiffs Senter and Laird were in the office of Mr. Knight when the contract signed by Prather and associates was prepared, at which time witness inquired whom Prather represented, whereupon both Prather and Laird declared that Prather was acting for all parties concerned. In our opinion the testimony did not, as urged by plaintiffs, tend either to contradict or vary the terms of the written contract. The evidence tended to prove, if anything, merely that which the contracts indicated, and, since there was a denial by some of the parties that they were bound thereby, the statements made by those present at the time of the preparation of the contract were admissible on that issue for such consideration as the jury might accord it.

[11, 12] Error is assigned upon the action of the trial judge in interrogating the witness Henry D. Lindsley. Differences having arisen between counsel concerning whether the witness said that certain subsequent acts of those interested were in pursuance of the compromise agreements, the court interrogated the witness and elicited from him in substance that the organization of the Fowler Land Company was, among other things, in consummation of the compromise agreements, not every detail, but the general purpose sought thereby. The testimony in our opinion was both pertinent and relevant on the issue of compromise. The fact that it was elicited by the court did not, of course, rendered it any the less admissible.

Error is also assigned on the action of the trial judge in further eliciting, over plaintiffs' objection, from the witness Lindsley the statement that the Fowler Land Company represented the original arrangement, with Carwile's interest out, and the further fact, which the court declared he desired for public information, that the Fowler Land Company had entered into a contract to sell the Fowler tract to the Industrial College for Colored Youth of Texas for $45,000.

[13] The objection disclosed by the bill is, in effect, that the information was highly prejudicial because suggestive of the attitude and private opinion of the court concerning the issues before the jury. The action of the court did not, in our opinion, indicate any bias or predilection for or against either side to the controversy. While we agree that the fact that the land was sold did not prove or disprove any material issue in the case, we are not prepared to agree that it was prejudicial for the reasons set out in the bill.

[14] Further, according to the qualification of the bill no objection was made to the matter complained of at the time, but was presented and raised for the first time approximately five months subsequent to the trial. Objection to any consideration of the issue is made on that ground and ought to and will be sustained.

There are 22 assignments of error calling into review the correctness of as many issues of fact submitted to the jury and under which there is submitted a total of 98 propositions

for separate consideration. To consider the points seriatim would extend this opinion beyond the point of toleration, which is our excuse for reciting the fact. Notwithstanding the assignments are, in our opinion, multifarious under the rules prescribed by the Supreme Court, we have examined the issues so submitted and the points urged thereunder and reached the conclusion that there is nothing shown which would authorize a reversal of the case. The interrogatories do not, in our opinion, present the issues as clearly as might easily have been done, and yet each does embrace issues of fact material to the determination. of the case and which the parties had a right to submit. In some instances the interrogatories embrace more than one disputed issue, but the answer to the interrogatory, as well as the answers of the jury to all the interrogatories, consisting of 28 by plaintiffs and 22 by defendants, a total of 50 special issues of fact, indicate that the error, if any, was harmless, and did not amount to such a denial of plaintiffs' rights as was reasonably calculated to or did cause the rendition of an improper verdict.

[15-17] It is urged that the court erred in charging the jury that the burden of proof was upon plaintiffs "to make out their case by a preponderance of the evidence," for the reason that such burden was upon defendants on the issue of compromise and settlement. The charge, in our opinion, was not error.

"The general rule is that the burden of proof 'remains on a party offering a fact in support of his case, and does not change in any aspect of the cause; though the weight of evidence may shift from side to side, according to the nature and strength of the proof offered in support or denial of the main fact to be established.' * * * The same rule holds in reference to defendants, when they set up an independent fact by way of confession and avoidance. Thus they admit the plaintiffs' case, and as to such case assume. the onus probandi. As in an action of debt, when the defendant pleads payment, accord and satisfaction, a discharge in bankruptcy," etc. Clark v. Hills, 67 Tex. 141, 2 S. W. 356.

It would have been appropriate and correct for the court to have further instructed the jury that the burden was upon the defendants to prove that they had adjusted and compromised their liability upon the stock subscriptions, for obviously the burden in that respect was upon them. The court failing to do so, it was the duty of plaintiffs to either object to the main charge on the ground that it did not instruct that the burden was upon defendants on the facts affirmed by them, or to tender a special charge in that respect. They observed neither rule. As a consequence the matter cannot be reviewed.

[18, 19] There are five assignments of error which assert that the court erred in refusing to grant the plaintiffs another trial on the ground of newly discovered evidence. It will serve no good purpose nor preserve to plaintiffs any benefit by reciting the evidence contained in the motion. We have read and considered it. It is cumulative in tendency and bears more upon the motive of defendant Carwile than upon the controlling issues in the case. In any event, the facts presented at most called for the exercise of the court's discretion, and the facts not being of such character or controlling force as to indicate that the court was imprudent or that his judgment was inherently unsound, his action does not show an abuse of his discretion, which, being true, ought not to be interfered with.

There are some assignments of error which we have not discussed for the reason that to do so would extend the opinion beyond the proprieties, but which are overruled for the reason that they do not, in our opinion, present reversible error.

Finding no reversible error in the record, the judgment is affirmed.

Affirmed.