### TRADERS & GENERAL INS. CO. v. COLLINS.

#### No. 11621.

Court of Civil Appeals of Texas. Galveston.

March 30, 1944.

Rehearing Denied April 20, 1944.

Kemper, Hicks & Cramer, of Houston,. and Lightfoot, Robertson & Gano, of Fort Worth (E. B. Robertson, of Fort Worth,. of counsel), for appellant.

Cain & Cain, of Liberty, and Allen, Helm & Jones, of Houston (Everett H. Cain, of Anahuac, and Albert P. Jones,. of Houston, of counsel), for appellee.

GRAVES, Justice.

This appeal, in a compensation case, arising from the claimed injuries appellee received on June 12 of 1942 from the falling upon him of the gasoline truck he was then driving for his employer, is from a judgment, in appellee's favor against appellant, of the 80th District Court of Harris County, sitting with a jury, entered in part upon the jury's verdict in response to special issues submitted, and in part upon independent findings of the court itself from the evidence, in material substance as follows; to-wit:

"For total permanent incapacity at a compensation rate of $20.00 per week for the period of 401 weeks from the date of the injury, less a credit of $249.30, heretofore paid to plaintiff by the defendant in weekly benefits, and further providing that the matured payments, less said credit, now amounting to $1,184.84, should be paid by the defendants to the plaintiff, and that in addition thereto the defendant should pay to the plaintiff the sum of $6,-631.43 in weekly installments of $20 per week, the first installment becoming due on October 18, 1943, and should run for a period of 331 weeks and four days from the date of the entry of this decree."

The cause had been taken by the appellee to the court below, on April 27, of 1943, in protest against a previous award made to him by the Industrial Accident Board, which he had been unwilling to accept—his pleadings and these consequent special-issues having plainly raised the fact-questions, upon which the quoted findings of court and jury of total and permanent disability were based.

■ Appellant neither objected nor excepted during the trial to the sufficiency of either these pleadings or issues. Hence it may not do so on appeal. Rule 274, Texas Rules of Civil Procedure; Galveston Theatres v. Larsen, Tex.Civ.App., 124 S.W.2d 936.

In inveighing here against such action of the trial court, appellant relies upon seven stated points-of-error, which may be summarized in this way:

(1) The alleged error of the court in permitting Dr. J. E. Bell to testify, over appellant's objection, first, as to his conversation over the telephone with Dr. Tucker, relating to the destruction of X-ray pictures of the appellee taken by Dr. Bell prior to the institution of this suit, on the ground that it was hearsay; second, in further permitting Dr. Bell to testify as to what such X-ray pictures had revealed, the pictures themselves not having been produced nor introduced in evidence on this trial.

(2) The finding in both the verdict and the judgment that appellee sustained total and permanent incapacity as the result of his alleged injuries is contrary to the great preponderance of the evidence, is not supported by the pleadings or the evidence, and is manifestly wrong.

(3) The finding in both the verdict and the judgment holding the appellant liable to the appellee for a wage-rate fixed under subsection 3, section 1, Article 8309, Vernon's Texas Civil Statutes, as being just and fair to both parties, was manifestly wrong and contrary to the great weight and preponderance of the evidence, in that there was no sufficient evidence to support the jury's finding that there was no other employee of appellee's class who had worked the whole of the preceding year.

(4) The court reversibly erred "In permitting the jury to change their verdict and answers to Special Issues Nos. 6, 7, 8, 11, 12 and 13, after such verdict had been received and accepted by the Court as a sealed verdict, and in orally instructing the jury, without appellant's consent, and in response to questions of the foreman, that the jury would have the right to change their answers to questions other than those which the Court, by written instructions, had advised the jury were in conflict, and that they would have the right to change their answers to as many of the questions as they might desire."

(5) The court erred in permitting appellee's counsel in his opening argument to the jury, over appellant's objections made at the time, to engage in improper argument to the jury, that was prejudicial to the appellant's cause.

After painstaking consideration of the record, the briefs, and oral arguments of counsel for both sides, it is concluded that none of appellant's points for a reversal should be sustained.

When reduced to its ultimate, the two-pronged objection to the testimony of Dr. Bell, relating to the X-ray pictures he had taken of the appellee following his injury and before this trial, gets down to the one legal question presented here, of

whether or not there was laid a sufficient predicate for the admission of, first, Dr. Bell's objected-to testimony as secondary proof of what the X-ray pictures revealed as to the appellee's condition, and, second, of Dr. Tucker's statement over the telephone to Dr. Bell that he had destroyed such X-ray pictures—along with other things left by Dr. Bell in his Liberty office —when Dr. Tucker succeeded him there.

Appellant insists that no such predicate was properly laid in this instance, in that a fair appraisal of Dr. Bell's testimony shows that he did not know whether the X-rays he had so taken and left in his office at Liberty, Texas, had been lost or destroyed; but that he had merely assumed, from the hearsay statement of Dr. Tucker to him of the latter's having destroyed all left-over papers in that office when he took the same over from Dr. Bell, that they had been destroyed; that Dr. Bell's conversation over the long-distance telephone, in which Dr. Tucker had said that he also destroyed the X-ray pictures, was purely hearsay, inadmissible, and did not establish the loss or destruction of these X-rays.

That contention, however, loses much of its force, it is thought, when these circumstances inhering in the incident are considered: On December 16, 1942, Dr. Bell, at the request of appellant, examined the appellee, took the X-ray pictures of him, and made a report to it of his findings thereon; on September 1, 1943, thereafter, Dr. Bell left Liberty, where he had long practiced medicine, and moved his office to Houston, taking there with him all his X-ray files covering the period of six months next preceding his departure from Liberty; he carefully searched these files at Houston and did not find the Collins X-rays, he having left all his films that were thus (as these were) more than six months old in his old office at Liberty, where Dr. Tucker meanwhile had succeeded him; Dr. Bell further testified that he had had occasion to look for these films also there at Liberty, and that he had not been able to find them, but did find that they had been removed from his old office, he saying he found out they had been destroyed; when he so left Liberty he sold his clinic to Dr. Tucker, and when he was requested to bring these films to Houston to testify upon this trial he inquired of Dr. Tucker, as the last custodian thereof, as to what disposition the latter had made of Dr. Bell's abandoned films at Liberty, and was informed that Dr. Tucker had destroyed them, along with other things found in the Liberty office when he took it over.

It accordingly seems clear that the appellee, before offering the testimony of Dr. Bell concerning them, had given as complete and adequate an explanation of his inability to offer the original films in evidence as could reasonably have been expected of him. He had not himself caused them to be made. On the contrary, Dr. Bell had been chosen by the appellant itself to make them, and they had been left by it in his possession; the bona fide effort of the appellee to get them into the evidence on this trial, especially as the witness through whom that was attempted, Dr. Bell, was in court in answer to a subpoena to be there, seems self-evident.

■ Wherefore, it is held that the trial court did not abuse its discretion in receiving this secondary evidence, not only as to the disclosures by Dr. Bell of what such X-ray pictures had shown, but also as to his having learned through a long-distance telephone conversation with Dr. Tucker that the latter had destroyed them when he took over Dr. Bell's old office at Liberty. 17 Tex.Jur. 498; Dancy v. Missouri-Kansas-Texas Ry. Co., Tex.Civ.App., 49 S.W.2d 910; American National Ins. Co. v. Points, Tex.Civ.App., 81 S.W.2d 762; Slaughter v. Morton, Tex.Civ.App., 195 S.W. 897; Rule 434, par. 2, Texas Rules of Civil Procedure.

Neither is this court prepared to hold that the jury's finding that appellee sustained permanent and total incapacity to work, within the meaning of our Compensation Law, was so against the great weight and preponderance of the evidence as to have been manifestly wrong.

Lying at the base of the great body of testimony upon this issue is the fact that all five medical witnesses for the appellant testified that the appellee had received a "compression", or crushing fracture of one of the upper dorsal vertebrae, they differing among themselves only as to which one of such vertebrae had been so injured; not only so, but that testimony is also persuasive in support of the further finding that the condition of the appellee's back was permanent.

■ While the jury was not limited to the testimony of these medical witnesses

touching the extent and probable duration of the appellee's injuries (Traders & General Ins. Co. v. Ray, 128 S.W.2d page 82, column 2), there is clearly enough of it favorable to him, when taken and weighed in connection with all the other facts and circumstances, for it to have concluded that the man had been totally incapacitated thereby from ever thereafter following the same occupation he had been engaged in prior thereto.

■ Our authorities have long held that, under our Compensation Law, total incapacity does not mean utter inability to do any work at all, but that a man's disability is total, within its purview, when he can no longer "secure and hold employment for physical labor" such as he had to do to make a living prior to his injury. 45 Tex.Jur., page 588, par. 161; Traders & General Ins. Co. v. Ray, Tex. Civ.App., 128 S.W.2d 80; Davies v. Texas Employers Ins. Ass'n, Tex.Com.App., 29 S.W.2d 987; Southern Underwriters v. Grimes, Tex.Civ.App., 146 S.W.2d 1058.

■ These authorities further establish the principle that the mere working and earning of money after injuries are sustained is not conclusive on the question of a claimant's incapacity, but is an evidentiary matter only, to be considered with other facts and circumstances before the jury.

■ Neither, it is thought, did the motion-picture films taken of this appellee while operating a filling-station subsequent to his injury which were exhibited both to the trial court and to this court, have any conclusive effect as tending to show that he was not so permanently and totally injured as the jury found him to be; these pictures showed only some fourteen minutes of activity upon the part of the appellee in about six hours of exposures, and the jury was not beyond its province in concluding, notwithstanding his evident capacity at that time to do light work, such as the films showed him with apparent facility able to do, that his structural injuries the five doctors all admitted him to have, subsequently settled down upon him to the extent of rendering him permanently disabled from ever doing the heavy work in the future that he had been required before his injury to do as his only means of livelihood.

The testimony on his side showed that he received a very serious injury on June 12 of 1942; that as a result of it at various times he spent many days in the hospital, that he was for more than three months required to wear a heavy body-cast, that at the time of the trial, sixteen months after the injury, he was still suffering from a continual aching of the muscles in his back, that when he attempted to use his arms his nerves appeared to go to pieces, his left hip continued to be sore, and he was unable to get a normal amount of sleep and rest at night, averaging only about four hours thereof.

Further, that he was unable to continue the light work the films reflected, because of the effect of his injuries; that he had to give up his own filling-station because he could not do the hard work it required, and was unable to procure hired help for that purpose; indeed, that while he was operating that station it had been necessary for his wife to assist him in doing so. It is also shown that, while he had driven a taxicab four nights, he had to give that up because of his disability, having only taken up that effort under the necessity of procuring support for his family.

Moreover, it appeared, without dispute, that he had had to rest between periods of such light work as he had thus been able to do; that he had continued to suffer from severe headaches, which condition seemed to be growing worse at the time of the trial, and that the same condition prevailed as to his back, particularly, and his body generally; that at the time of the trial he had become reduced to fifteen pounds under his normal weight.

In a word, Dr. Bell in the capacity of a witness for the appellee, testified that he saw the latter on December 16 of 1942, having then examined him at the request of the appellant, and in his opinion appellee had sustained a serious injury and had not at that time been able to work; Dr. Bruhl, also, testified that his examination revealed considerable limitation of motion in appellee's back, and that there was an involvement of the sacro-iliac joints; that appellee was suffering from the effects of a concussion of the brain, that he attributed appellee's loss of weight to this sued-for injury, and that his examination did not reflect evidence of any disease or other bodily infirmity which was causing the disability he then suffered from; in sum, he said the injury received by appellee was serious, and that in his opinion

he would never again be able to hold a job that required him to engage in any strenuous labor.

This court has no difficulty in overruling appellant's contention that the $20 per week compensation-rate, fixed as in compliance with subsection 3, section 1 of cited Article 8309, was without support in the evidence; to the contrary, it is held that the evidence was sufficient to support, if it did not require, the finding upon the jury's part that the appellee did not work substantially the whole of the year preceding the date on which he was injured, and that no other employees of appellee's class worked for that length of time; but that they were shown to have been similarly employed for only four and a half or five days per week.

Much of the testimony upon which this finding was made came from the appellee himself, and proceeded from his own experience and knowledge of the conditions it dealt with. He said he moved to Hardin during the latter part of August, 1941, that he did not work as much as 300 days during the year preceding his injury, that he was familiar with the work truck-drivers were doing there, and that he knew the nature and amount of work they were doing; that they would average about 4½ or 5 days a week, which was his own average, while he worked for O. F. Campbell, his employer; further, that he did not know of anyone who worked on a greater average per week; that his own daily wage when he did so work was $6. The appellant itself offered no testimony on this feature, hence little if any doubt was raised as to the correctness of appellee's version thereof. Federal Underwriters Exchange v. Stewart, Tex.Civ.App., 109 S. W.2d 1031; Service Mutual Ins. Co. of Texas v. White, Tex.Civ.App., 138 S.W. 2d 273; Postal Mutual Indemnity Co. v. Penn, Tex.Civ.App., 165 S.W.2d 495; Federal Underwriters Exchange v. Arnold, Tex.Civ.App., 127 S.W.2d 972; Traders & General Ins. Co. v. Crouch, Tex.Civ.App., 113 S.W.2d 650; Federal Underwriters Exchange v. Cost, Tex.Civ.App., 115 S.W.2d 706.

Under this testimony and the cited authorities, notwithstanding the fact that the burden was upon the appellee to show at least prima facie evidence that there was no employee in the same community doing the same or similar work as he was doing, the jury's finding upon the testimony indicated, and the court's holding based thereon, should stand.

Appellant's fourth contention, that the court reversibly erred in permitting the jury to change its verdict on special issues 6 to 8, inclusive, and 11 to 13, inclusive, must stand or fall upon substantially these facts:

"The jury deliberated until about 10:30 o'clock that evening, when it delivered a sealed verdict to the bailiff. Acting under instructions of the trial judge and in accordance with the established practice in Harris County, the jurors were permitted to separate and go to their homes for the night. They were instructed to return to the courtroom at 9 o'clock next morning.

"When the jurors reassembled, the Court inquired of the foreman as to whether a verdict had been reached. The foreman replied that they had arrived at their verdict, with the possible exception that they desired to know as to what effect their answer to one of the issues (No. 13) submitted by the Court was, and, thereupon, the trial Judge instructed the jury to retire to the jury room and write out any questions they desired to submit to the Court.

"After about 30 minutes, the jurors returned with the original sealed verdict, together with the explanation of what it intended to find in response to special issue No. 13. The Judge again inquired of the foreman if a verdict had been reached, and was informed that such was the case. At that time the verdict was handed to the Judge, together with the explanation of its interpretation of the answer which it had given to special issue No. 13. The answers of the jury were read in open court. At the request of counsel for plaintiff, the Court again requested the jury to retire and write on the answer-sheet the explanation theretofore submitted to the Court on a separate sheet of paper, and the jury's explanation of the answer to special issue No. 13. The verdict, as originally delivered by the jury to the Judge, contained findings both of total, permanent disability, and partial, permanent disability. The fact that there was a conflict was called by appellee's attorney to the attention of the Court while the jurors were in retirement for the purpose of placing upon the answer-sheet the explanation with regard to special issue No. 13. When the jurors returned to

the jury box in the court room the Court called their attention to the conflict in this instruction:

"'After having received your verdict and considered the same, the Court now directs your attention to a conflict between your verdict. In answering special issue No. 3 you have found that the total incapacity of the plaintiff was permanent and you find he had total and permanent incapacity and in answer to special issue No. 6 and 8 you have found he suffered partial incapacity and that the partial incapacity is permanent. A person cannot have total permanent incapacity and at the same time have permanent partial incapacity. I, therefore, direct your attention to this conflict in your verdict and you will again retire and consider your verdict.' Counsel for appellant did not reserve any exception to this charge.

"As the jurors were preparing to leave the jury box, the foreman inquired of the Court if there was any other conflict in the verdict. The Court stated that he was not permitted to answer that question. The foreman then asked if the jurors might change their answers to other issues, and the Court replied that it would be permissible for them to change the answer to any of the issues they might desire to change. Counsel for appellant was present in the courtroom during these proceedings, and took no exception of any kind to the action of the Court.

"After further deliberations, the verdict—as finally agreed upon by the jury— was delivered to the Court, and was received and accepted by him and ordered filed. When the Court announced that he was accepting the verdict of the jury as finally agreed upon, counsel for appellant excepted to the action of the Court in accepting said verdict. That was the only time that any exception was taken to any of the proceedings in connection with the deliberations of the jury."

■ The upshot of these proceedings, it is thought, reduces that matter to an instance of the jury's verdict having been found to have contained conflicting findings; hence the court properly retired the jury for the purpose of reconciling such findings, which constituted no prejudicial error nor improper procedure under these authorities; Rule 295, Texas Rules of Civil Procedure; Traders & General Ins. Co. v. Carlile, 138 Tex. 523, 161 S.W.2d

484; Southern Underwriters v. Kelly, Tex. Civ.App., 110 S.W.2d 153.

■ This quoted written instruction was prepared by the court in the presence of counsel for both sides, no exception thereto being reserved by either, and was then duly read to the jury. This court regards that action, instead of being "an illegal comment by the court", a proper compliance with Rule 295 and with the holding of the Supreme Court in the cited Carlile case, which is considered to be controlling on the precise point.

■ Neither did the oral statement of the court, in response to the question by its foreman as to whether the jury might change its answers to other issues than those relating to the pointed-out conflict, give the jury any additional instructions on the law of the case, in violation of Rules 271, 272, and 275, Texas Rules of Civil Procedure, as is further urged by the appellant, which cites no decisions supporting that position; this because, in the attending circumstances, the jury, when so told by the court they might change their answers as they chose to any of the other issues, simply harked back to the court's original charge to them, that if they answered special issue No. 6 "No", then they need not answer the six succeeding issues; when, therefore, they finally determined, in eliminating the conflict, to change their answer to No. 6 from "Yes" to "No", their answers to issues Nos. 7, 8, 11 and 12 were automatically eliminated; that was all, the record indisputably showing that no other change was made in the verdict, wherefore the court's severely-criticised remarks in this connection obviously had nothing to do with the jury's decision to let its affirmative answer to special issue No. 3—finding total and permanent disability of the appellee—stand alone, instead of its answer to No. 6, finding that he likewise had partial and permanent disability, since that change in the answer to No. 6 had the effect of withdrawing the other issues from their consideration.

■ In no event, it would seem, was this recitation an expression from the bench of that character which was reasonably calculated to cause and probably did cause the rendition of an improper judgment. Rule 434, Texas Rules of Civil Procedure.

532

It is equally clear that—by its failure to except thereto at the time these proceedings occurred—appellant incurred a waiver thereof, and left itself in no condition to complain on appeal, McGuire v. Roemer, Tex.Civ.App., 162 S.W.2d 1048; C. H. Mountjoys Parts Co. v. Perfect Circle Co., Tex.Civ.App., 119 S.W.2d 186; Baker Hotel v. Rogers, Tex.Civ.App., 157 S.W.2d 940; Herndon v. Halliburton, etc., Tex.Civ.App., 154 S.W.2d 163; Donoho v. Carwile, Tex.Civ.App., 214 S.W. 553; Sabine & East Texas R. Co. v. Broussard, 75 Tex. 597, 12 S.W. 1126.

Appellant's seventh point isolates three or more extended excerpts from the opening argument of appellee's counsel to the jury, which it vigorously urges were improper and prejudicial. These excerpts are too long for full quotation here, but the gist of them, together with notation of objections made thereto at the time, as well as rulings by the court thereon, is this:

"We have an Insurance Company paying him $13.00 a week for six days over four months. If he had the cast off on the 18th of October, he had just gotten it off. Is that fair play? * * * We say if the cast was off of him at that time it had just been cut off, and yet they tell him they are through with him." (Here appellant's attorney objected because "there is no evidence to support that", which the court overruled.)

"By their own testimony it had been proven that the Insurance Company felt since they cut him loose they had better start building of a defense to see if they could not get out of paying this boy what he had coming to him. They show you some moving-pictures, and I say those pictures, having been shown twice, I do not think any of you will see the situation different in those pictures from what Collins testified to on the witness stand. He did not come before you telling you he had been bed-ridden; they did not have to have the pictures to show that, he testified to it; and they say yes, we expected Collins to get on the witness stand and lie and we are building up a defense. Now, Gentlemen—"[Another objection interposed by appellant's counsel, and overruled]. * * * "

"Everyone of their own doctors say this injury disabled him and it is going to stay with him. It is not temporary. * * * Dr. David was not over there in Beaumont at the bedside of that baby. Dr. David has no information about what happened to that cast; this boy and his wife told you a story which I think you should believe. That cast on his back was around his neck five weeks and he told you he lost weight and the cast came loose. * * * And they say why did he not come immediately to Dr. David. He tells you he was there at the bedside of his baby not expected to live. Are you gentlemen going to crucify him because he stayed at the bedside of his baby—[On appellant's request, the court instructed the jury not to consider this last question]. * * *"

"I say no man ought to go through what that crippled boy did before Dr. David, simply because he did not leave the bedside of his baby. The Traders & General was paying that boy $13.80 and he told you he did not have the money to come over here, and I believe him. He had five people to feed on $13.00 a week—[On appellant's objection and request the court instructed the jury not to consider this last-quoted statement]. * * *"

"There is another reason why I tell you that $6.00 a day is right. Don't you know that if Tom Collins got on this witness stand and swore to a lie about that $6.00 a day that Mr. Campbell or somebody else would be here to testify that he was not telling the truth. * * * There are not any records or testimony to disprove it, it has not been brought before you and if that $6.00 a day figure was not right don't you know it would be contradicted. * * * If there was better evidence to disprove it, and there is not any, you gentlemen know that boy is telling the truth when he tells you the average daily wage was $6.00 and that would be right and fair, it is on a basis of what a man gets paid that the Insurance Company gets its money." (On appellant's objection, the appellee's attorney withdrew this last statement, and the court directed the jury not to consider it).

As indicated, the first of them related to counsel's statement that appellant told appellee they were "through with him", after having paid him only $13 a week for six days over four months immediately after the cast had been cut off of him.

The undisputed evidence showed that notwithstanding his enduring ills, as before detailed, appellant did cease paying all benefits to the appellee after October 18 of that year, hence the deduction from such

a surrounding state of facts that it, in effect, was saying to him that it was through with him was not beyond the pale of permissible argument.

The second one had to do with counsel's attributing to appellant the attitude that it expected the appellee Collins to get on the witness stand and lie, and that in consequence it was taking the moving pictures of him, and was thereby "building up a defense" against his suit.

When the statement of facts is looked to in this connection, it will be found that appellant's moving-picture operator, as a witness in its behalf, testified directly to the state of mind and the objective counsel thus attributed to the appellant. It follows, as a matter of course, that it was not out of line for appellee's counsel to remind the jury of that attitude of the insurer, especially since such testimony in its behalf was admitted without any objection from either side. Peden Iron & Steel Co. v. Claflin, Tex.Civ.App., 146 S.W.2d 1062; A. B. C. Storage & Moving Co. v. Herron, Tex.Civ.App., 138 S.W.2d 211.

The third feature of the argument was counsel's rhetorical question to the jury, "Are you gentlemen going to crucify him because he stayed at the bedside of his baby?" As before indicated, the court promptly instructed the jury not to consider that statement, which, it is thought, removed any harmful effect there may have been in it.

Especially so, when the setting showed that with a wife and three children to support on a compensation of $13.80 per week, the appellee, without controversion, testified he had no money to go to Houston from Beaumont on, because of the fact that he so had these five people to feed on that small sum.

Such remarks accordingly—the court having directed the jury to disregard them —are not considered to have been prejudicial, under such authorities as these: Ramirez v. Acker, 134 Tex. 647, 138 S.W.2d 1054; Moncada v. Snyder, 137 Tex. 112, 152 S.W.2d 1077; Peden Iron & Steel Co. v. Claflin, Tex.Civ.App., 146 S.W.2d 1062; Wright Titus, Inc. v. Swafford, Tex.Civ.App., 133 S.W.2d 287; Yellow Cab Co. v. Treadwell, Tex.Civ.App., 87 S.W.2d 276; Barnhart Mercantile Co. v. Bengel, Tex.Civ.App., 77 S.W.2d 295.

The final remarks challenged had to do with appellee's counsel's reiterated insistence to the jury that $6 a day was right and fair as a wage-rate, and that "it is on a basis of what a man gets paid that the Insurance Company gets its money". Counsel, however, withdrew that statement immediately on objection thereto, and the trial court duly directed the jury not to consider it.

Appellant presented no evidence on that issue, while the appellee directly testified that he averaged that amount per day when he worked; and it would seem that the jury already knew, what may perhaps be said to be common knowledge, that a company insuring these benefits does get its money on the basis of what the employees are paid.

At any rate, the withdrawal and instruction are thought to have eliminated any prejudicial injury from these expressions. See Peden Iron & Steel Co. v. Claflin, Tex. Civ.App., 146 S.W.2d 1062; First States Life Co. v. Mote, Tex.Civ.App., 110 S.W.2d 591; McMullen v. Parker, Tex.Civ. App., 45 S.W.2d 1011.

These conclusions require an affirmance of the judgment; it will accordingly be so ordered.

Affirmed.